**AMGEN, INC., Plaintiff,**

v.

**CHUGAI PHARMACEUTICAL CO., LTD., and Genetics Institute, Inc., Defendants.**

**Civ. A. No. 87–2617–Y.**

United States District Court, D. Massachusetts.

Jan. 31, 1989.

D. Dennis Allegretti, Allegretti & Witcoff, Michael Borun, Richard Schnurr, Edward O'Toole, Marshall, O'Toole, Gerstein, Murray & Bicknell, Chicago, Ill., Allan Van Gestel, Goodwin Procter & Hoar, Boston, Mass., for plaintiff.

Ian Crawford, William Lee, Hale & Dorr, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This action involves the alleged infringement of several patents covering erythropoietin, a protein which circulates in the blood and stimulates the production of red blood cells. Erythropoietin is used primarily for the clinical treatment of anemia, particularly anemia caused by renal disease.

In essence, this case is a battle over turf. The plaintiff Amgen, Inc. ("Amgen") owns a patent, the claims of which include purified and isolated DNA sequences encoding erythropoietin as well as host cells transformed or transfected with a DNA sequence. The defendant Genetics Institute, Inc. ("Genetics") owns, and the defendant Chugai Pharmaceutical Co., Ltd. ("Chugai") licenses, a patent which involves compositions comprised of highly purified erythropoietin. Although the contested property rights may revolved about fundamental scientific principles, the issues raised here rattle, ostensibly at least, the traditional foundations of patent law; that is, how do putative proprietary interests in recombinant technology interact with traditional concepts of patent law?

This matter is presently before the Court on the motions of Chugai and Genetics for summary judgment pursuant to Fed.R.Civ. P. 56 on various claims asserted by the parties.

## I. FACTUAL BACKGROUND

Erythropoiesis, which is the production of red blood cells, occurs continuously throughout the human life span in order to offset cell destruction. This process enables a sufficient number of red blood cells to be available for proper tissue oxygenation, but not so many that such cells would impede blood circulation. Red blood cells are formed in the bone marrow, and this formation is stimulated by erythropoietin, a circulating glycoprotein.

The life of human red blood cells is about 120 days. Thus, about $\frac{1}{120}$ of the total red blood cells are destroyed daily in the reticuloendothelial system.[1] Concurrently, a relatively equal number of red blood cells are produced daily to maintain the level of such cells. Red blood cells are produced by the maturation and differentiation of erythroblasts[2] in the bone marrow; erythropoietin is the factor which acts on less differentiated cells and induces their differentiation to red blood cells.

---

1. The reticuloendothelial system "function[s] in elimination of worn out cells, esp[ecially] red blood cells; in repair of injured tissue; and in defense mechanisms, both local and general, of the body." *Taber's Cyclopedic Medical Dictionary* 1481 (C. Thomas ed. 15th ed. 1985).

2. An erythroblast is "[a] young or immature red blood cell, i.e., the precursor of an erythrocyte, the normal, mature red blood cells." 2 J. Schmidt, *Attorney's Dictionary of Medicine* E–128 (1988).

Because erythropoietin is a stimulating factor in the production of red blood cells, it is a promising therapeutic agent in the treatment of those blood disorders characterized by low or defective red blood cell production such as anemia and, in particular, renal anemia. The use of erythropoietin, however, is not common in practical therapy at the present time because it is not yet widely available.

The preparation of erythropoietin products generally has been accomplished through the concentration and purification of urine from both healthy patients and those exhibiting high erythropoietin levels, such as those patients suffering from aplastic anemia. Erythropoietin also can be recovered from sheep blood plasma; however, such erythropoietin is expected to be antigenic in humans. Another technique for producing erythropoietin is recombinant technology in which erythropoietin is produced from cell cultures into which genetically engineered vectors containing the erythropoietin gene have been introduced. Regardless of the source, however, the erythropoietin protein must be purified to homogeneity in order to use it therapeutically.

It had been thought in the scientific community that erythropoietin purified by methods described by Miyake[3] was homogeneous as measured by a specific activity on the order of 80,000 International Units (IU) per absorbance unit (AU) at 280 nanometers (A280) (hereinafter, "IU/AU"). Dr. Rodney Hewick ("Dr. Hewick"), however, discovered that truly homogeneous erythropoietin has a specific activity of at least about 160,000 IU/AU and, further, that Miyake's erythropoietin composition is not in fact homogeneous, but contains large amounts of several non-erythropoietin protein contaminants. Dr. Hewick was subsequently successful in producing homogeneous erythropoietin.

On June 30, 1987, the United States Patent and Trademark Office ("the Patent and Trademark Office") awarded Dr. Hewick United States Patent No. 4,677,195 entitled "Method for the Purification of Erythropoietin and Erythropoietin Compositions" ("the '195 patent")[4] covering both a nonrecombinant method for purifying erythropoietin and compositions of highly purified erythropoietin. Dr. Hewick assigned the '195 patent to Genetics, a Delaware corporation having a principal place of business in Cambridge, Massachusetts. Genetics then licensed the rights of the '195 patent to Chugai, a Japanese corporation having a principal place of business in Tokyo, Japan.

The plaintiff Amgen is a Delaware corporation having a principal place of business in Thousand Oaks, California, and is en-

---

3. The method of Miyake, which was described by Miyake, et al. in 252 *J. Biol. Chem.* 5558 (1977), involves deactivating any proteolytic enzymes by preparing crude erythropoietin preparations with pheno p-aminosalicylate. The method of Miyake includes the following steps: ethanol precipitation, DEAE-agarose fractionation, sulfopropyl-Sephadex chromatography, gel filtration, and hydroxylapatite chromatography. *See* United States Patent No. 4,677,195 at cols. 2–3 (Declaration of Rodney M. Hewick in Support of Defendants' Motion for Summary Judgment of Patent Infringement [hereinafter, "Hewick Decl."], Exhibit A).

4. The relevant claims of the '195 patent, those which are allegedly infringed by Amgen, are the following:

1. Homogeneous erythropoietin characterized by a molecular weight of about 34,000 daltons on SDS PAGE, movement as a single peak on reverse phase high performance liquid chromatography and a specific activity of at least 160,000 IU per absorbance unit at 280 nanometers.

. . . . .

3. A pharmaceutical composition for the treatment of anemia comprising a therapeutically effective amount of the homogeneous erythropoietin of claim 1 in a pharmaceutically acceptable vehicle.

4. Homogeneous erythropoietin characterized by a molecular weight of about 34,000 daltons on SDS PAGE, movement as a single peak on reverse phase high performance liquid chromatography and a specific activity of at least about 160,000 IU per absorbance unit at 280 nanometers.

. . . . .

6. A pharmaceutical composition for the treatment of anemia comprising a therapeutically effective amount of the homogeneous erythropoietin of claim 4 in a pharmaceuticlly [sic] acceptable vehicle.

United States Patent No. 4,677,195 at cols. 8–10 (Hewick Decl., Exhibit B).

gaged in the development and the eventual commercialization of recombinant erythropoietin for human pharmaceutical applications. A division of Amgen, Amgen Biologicals, has manufactured and sold erythropoietin produced by recombinant DNA techniques since June 30, 1987, the date on which the '195 patent was issued. Chugai and Genetics assert that this recombinant erythropoietin [5] infringes the claims of the '195 patent.

The other principal patent in this litigation is United States Patent No. 4,703,008 entitled "DNA Sequences Encoding Erythropoietin" ("the '008 patent"). On October 27, 1987, the Patent and Trademark Office issued the '008 patent to the inventor Fu-Kuen Lin, who assigned it to Kirin–Amgen, Inc. ("Kirin–Amgen"), a California corporation owned equally by Amgen and Kirin Brewery ("Kirin"). Kirin–Amgen was created under a joint venture agreement between Amgen and Kirin for the purpose of the further development and eventual commercialization of recombinant erythropoietin for human pharmaceutical applications. The '008 patent "relates generally to the manipulation of genetic materials and, more particularly, to recombinant procedures making possible the production of polypeptides possessing part or all of the primary structural conformation and/or one or more of the biological properties of naturally-occurring erythropoietin." Unit-ed States Patent No. 4,703,008 at col. 1 (Complaint, Exhibit A). The claims of the '008 patent include numerous purified and isolated DNA sequences encoding erythropoietin in addition to host cells transformed or transfected with a DNA sequence. *See id.* at cols. 39–42.

On October 27, 1987, the same day that the '008 patent was issued, Amgen filed this action against Chugai and Genetics, alleging that 1) the defendants' production, use and sale of recombinant erythropoietin infringe the '008 patent; 2) the '195 patent is invalid, or, in the alternative, Amgen does not infringe the claims of the '195 patent, and; 3) the defendants' future activities vis a vis the production and sale of recombinant erythropoietin will infringe the '008 patent.

Thereafter, Amgen filed a complaint with the International Trade Commission ("the Commission") on January 4, 1988, alleging that Chugai's importation of recombinant erythropoietin, which is manufactured in Japan using genetically engineered host cells, violates Section 337 of the Tariff Act of 1930 (19 U.S.C. sec. 1337) and 19 U.S.C. sec. 1337a.[6] Chugai filed a motion for summary determination seeking to terminate the Commission's investigation. The Administrative Law Judge, however, denied the motion on March 7, 1988.

5. The Amgen erythropoietin has the following characteristics: 1) "The specific activity of Amgen Biologicals' ultrapure erythropoietin is 160,-000 units/A280 as determined by the *in vivo* exhypoxic polycythemic mouse bioassay ...," Amgen Biologicals, *Untitled Document on Human Recombinant Erythropoietin* (hereinafter, "Amgen Biologicals") at 1 (unnumbered) (December 1985) (footnote omitted) (Hewick Decl., Exhibit C); 2) "Ultrapure erythropoietin is a homogeneous preparation that yields a single band and peak when analyzed by SDS polyacrylamide gel electrophoresis and HPLC respectively," *id.* at 3 (unnumbered); 3) The average molecular weight of the recombinant erythropoietin on SDS–PAGE is 34,700 daltons, Declaration of Michael A. Recny in Support of Defendants' Motion for Summary Judgment of Patent Infringement at para. 7 (hereinafter, "Recny Decl."). Amgen also states in its own product literature that "[analysis] demonstrates biological and immunological equivalence between Amgen Biologicals' recombinant erythropoietin

and material derived from human urine." Amgen Biologicals at 1 (unnumbered).

6. Specifically, Amgen asserted in the complaint filed with the Commission:
Chugai imports into the United States recombinant erythropoietin manufactured in Japan by a process utilizing genetically engineered host cells containing DNA sequences coding for human erythropoietin. Utilization of such genetically engineered host cells constitutes infringement of the '008 patent claims. Chugai, therefore, is engaged in the importation of a product produced by a process covered by the claims of the '008 patent in violation of 19 U.S.C. sec. 1337a....
United States International Trade Commission Complaint Exhibit 22 at 1 (Exhibit B to the Memorandum in Support of Defendant Chugai Pharmaceutical Co., Ltd's Motion for Summary Judgment [hereinafter, "Chugai Memorandum II"] ).

Chugai and Genetics answered and counterclaimed in the present action, alleging that 1) Amgen has infringed the '195 patent; 2) the '008 patent does not provide patent protection for recombinant erythropoietin; 3) the filing of a complaint by Amgen with the Commission constitutes unfair competition; 4) the '008 patent is invalid; and 5) Amgen's utilization of the '008 patent constitutes a violation of Section 2 of the Sherman Act. Chugai and Genetics then filed a motion for partial summary judgment on the claim that Amgen infringes the claims of the '195 patent. On February 24, 1988, the Court heard oral argument and then granted the motion. Chugai filed a motion for summary judgment on May 12, 1988, and, after oral argument on June 24, 1988, the Court took the motion under advisement.

The Court will here treat the following matters:

(1) the motion of Chugai and Genetics for partial summary judgment—heard and decided on February 24, 1988—on the issue whether Amgen's product infringes the '195 patent; i.e., the Court will set forth the reasoning underlying its February 24 ruling;

(2) the motion of Chugai for summary judgment seeking a determination that the '008 patent is unenforceable due to Amgen's alleged acts of patent misuse or, in the alternative, that the '008 patent contains no process claims, and thus does not cover Chugai's process of manufacturing recombinant erythropoietin.

## II. DISCUSSION

Under Fed.R.Civ.P. 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Since one principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses," *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986), it is now well established that Fed.R.Civ.P. 56(e)[7] "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56[c], [e]); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d 985, 992 (1st Cir.1988).

Moreover, summary judgment is as appropriate in a patent case as in any other case where no genuine issue of fact exists and the movant is entitled to judgment as matter of law. *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656 (Fed.Cir.1986); *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (en banc) (plurality opinion). Addressing the propriety of summary judgment in patent cases, the Federal Circuit has stated:

Many, if not most, suits for patent infringement give rise to numerous and complex fact issues, rendering those suits inappropriate for summary disposition. Where no issue of material fact is present, however, courts should not hesitate to avoid an unnecessary trial by proceeding under Fed.R.Civ.P. 56 without regard to the particular type of suit involved.

*Chore–Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 778-79 (Fed.Cir.1983). In this vein, the complexity of the law and the arcane nature of the facts do not dictate whether a party survives a motion for summary judgment in a patent case. Rather, where no genuine issue of material fact exists and the moving party is entitled to

7. Section 56(e) provides, in pertinent part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
Fed.R.Civ.P. 56(e) (1988).

judgment as matter of law, the courts properly grant summary judgment to avoid long, complex, and expensive trials which are, in fact, unnecessary.

### A. Infringement of the '195 Patent.

On February 24, 1988, this Court granted the motion of Chugai and Genetics for partial summary judgment on the claim that Amgen's manufacture, use and sale of homogeneous recombinant erythropoietin infringe claims 1, 3, 4 and 6 of the '195 patent. This opinion sets forth the Court's reasoning.

The property rights conferred by a patent grant include the right to exclude others from making, using or selling the patented invention in the United States, 35 U.S.C. sec. 154;[8] *see also Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 135, 89 S.Ct. 1562, 1582, 23 L.Ed.2d 129 (1969). Such exclusive rights of the inventor are protected by 35 U.S.C. sec. 271(a),[9] which forbids others from trespassing upon the inventor's patent property. This trespass of another's patent property, otherwise known as "infringement of the patent," is the foundation of patent law.

Determining whether a certain patent has been infringed requires two steps: "first, the scope of the claims must be ascertained, and then the trier must decide whether the claims cover the accused devise." *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985). In other words, the initial inquiry is to delineate the boundaries of the patented invention, determin-

ing the limits of the patent claims as one who has brought an action for trespass must establish the boundaries of her real property.[10]

### 1. Interpretation of the Claims of the '195 Patent.

Any determination of the bounds of the patentee's rights begins with the words of the claims. The Supreme Court in *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) stated, "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim." *Id.* at 607, 70 S.Ct. at 855; *see Palumbo* 762 F.2d at 974; *McGill Inc. v. John Zink Co.,* 736 F.2d 666, 672–73, (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984). Thus, a patent is:

"a written contract between [an] inventor and the government.... The consideration given on the part of the inventor to the government is the disclosure of his invention.... The consideration on the part of the government given to the patentee for [such] disclosure is a monopoly for seventeen years of the invention [disclosed to] the extent of the claims allowed in the patent."

*Marcyan v. Nissen Corp.,* 578 F.Supp. 485, 498 (N.D.Ind.1982) (quoting *Krupp A.G. v. Midvale Steel Co.,* 191 F. 588[, 594 (3d Cir.1911)]) (bracketed material restores original language of *Krupp A.G.* quotation), *aff'd sub nom. Marcyan v. Marcy*

---

**8.** Section 154 provides, in pertinent part:
Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, ... of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof.
35 U.S.C.A. sec. 154 (West 1984).

**9.** Section 271(a) provides, in pertinent part:
[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
35 U.S.C.A. sec. 271(a) (West 1984).

**10.** Addressing this inquiry of determining the scope of the patent, the Supreme Court has stated:

The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute,—'He can claim nothing beyond them.' *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917).

*Gymnasium Equip. Co.*, 725 F.2d 687 (7th Cir.1983). Therefore, the interpretation of patent claims is conducted according to the same general rules of construction as other contracts. *See Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227, 26 L.Ed. 149 (1880).

First, if the language of the patent claim is clear, unambiguous, and undisputed, the claim is interpreted according to the words of the claim without requiring any reference to extrinsic evidence. *See Palumbo*, 762 F.2d at 974; *McGill*, 736 F.2d at 673 n. 5. If, however, the language of the claims is disputed, the court may consider a host of factors in construing such claims. *McGill*, 736 F.2d at 673; *see also Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569–71 (Fed.Cir.1983). These factors include the prosecution history of the patent, the patent specification, the other claims in the patent, and the prior art. *See SRI Int'l*, 775 F.2d at 1118 (plurality opinion); *McGill*, 736 F.2d at 673–75. These questions of patent construction are questions of law for the courts, not questions of fact for the jury. *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 357 (3d Cir.1981), *aff'd*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Studiengesellschaft Kohle v. Eastman Kodak Co.*, 616 F.2d 1315, 1324 (5th Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

In the instant case, the literal scope of the relevant claims of the '195 patent as described therein has not been disputed by the parties. The words of those claims are as follows:

1. Homogeneous erythropoietin characterized by a molecular weight of about 34,000 daltons on SDS PAGE, movement as a single peak on reverse phase high performance liquid chromatography and a specific activity of at least 160,000 IU per absorbance unit at 280 nanometers.

.     .     .     .     .

3. A pharmaceutical composition for the treatment of anemia comprising a therapeutically effective amount of the homogeneous erythropoietin of claim 1 in a pharmaceutically acceptable vehicle.

4. Homogeneous erythropoietin characterized by a molecular weight of about 34,000 daltons on SDS PAGE, movement as a single peak on reverse phase high performance liquid chromatography and a specific activity of at least about 160,-000 IU per absorbance unit at 280 nanometers.

.     .     .     .     .

6. A pharmaceutical composition for the treatment of anemia comprising a therapeutically effective amount of the homogeneous erythropoietin of claim 4 in a pharmaceuticlly [sic] acceptable vehicle.

United States Patent No. 4,677,195 at cols. 8–10 (Hewick Decl., Exhibit A). The erythropoietin composition covered by the '195 patent claims may therefore be broken down into essentially four characteristics: 1) homogeneous; 2) molecular weight of about 34,000 daltons on SDS PAGE; 3) movement as a single peak on reverse phase high performance liquid chromatography, and; 4) a specific activity of at least about 160,000 IU per absorbance unit at 280 nanometers.

2. Infringement of the '195 Patent by the Amgen Product.

Once the scope of the patent is defined, the second inquiry focuses on determining whether the accused matter falls within the limits of the patent claims as properly interpreted. *E.g., Palumbo*, 762 F.2d at 974; *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984). Because this second question, a comparison of the accused matter to the claims of the patent, is a question of fact, *see Palumbo*, 762 F.2d at 974; *Envirotech*, 730 F.2d at 758, a motion for summary judgment on this issue should be approached with great care, *Palumbo*, 762 F.2d at 974.

Granting summary judgment on this issue, however, is not precluded merely by the necessity of an onerous factual comparison between the patent claims and the accused device. Where the patentee demonstrates that the accused device embodies every element of the patent claim, literal infringement is established. *Stewart–Warner Corp. v. City of Pontiac*, 767 F.2d

1563, 1570 (11th Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Prods. Co.*, 757 F.2d 255, 257 (Fed.Cir.1985). In the case where literal infringement is indeed established, the case ends; a trial on the issue of infringement is not then necessary.[11]

■ In the present case, this Court must determine whether the Amgen recombinant erythropoietin, broken down into the relevant characteristics of the erythropoietin composition covered by the '195 patent, infringes the claims of the '195 patent. As a preliminary matter, Amgen does not dispute that its recombinant erythropoietin is a homogeneous preparation.[12] In opposing the motion for partial summary judgment, Amgen argued that its recombinant product has an apparent molecular weight of about 32,000 to about 38,000 daltons on SDS PAGE, and therefore does not fall within the scope of the '195 patent claim. *See* Amgen's Opposition to Chugai/GI's Motion for Summary Judgment at 12 (hereinafter, "Opposition Memorandum I").

The Court does not agree. Dr. Michael A. Recny ("Dr. Recny"), the head of the Structural Protein Chemistry Laboratory at Genetics, examined a sample of the Amgen recombinant erythropoietin and determined that the Amgen product has a molecular weight of a range of 33,000—36,400 daltons on SDS–PAGE, or an average molecular weight of 34,700 daltons. Recny Decl. at paras. 1, 7. He further stated that such molecular weight falls within the scope of the erythropoietin composition covered by the '195 patent which is characterized by a molecular weight of about 34,000 daltons on SDS–PAGE. *Id.* Furthermore, in an article describing the human erythropoietin gene, certain Amgen scientists assert that the molecular weight of the recombinant erythropoietin is 34,-000.[13] *See* Sadler Decl. at para. 14.

Presented with these asserted facts, this Court ruled that there was no genuine issue of material fact vis a vis the molecular weight of the recombinant erythropoietin. Even if the Court were to accept Amgen's argument that the recombinant erythropoietin has a molecular weight of about

**11.** If these requirements of literal infringement are not satisfied, however, the infringement analysis does not end there. That is, even if the accused device does not fall within the literal reading of the patent claims, the test of equivalence—whether the accused device "performs substantially the same function in substantially the same way to obtain the same result," *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) (quoting *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 [1929])—is a crucial question concerning infringement. Otherwise, "[t]o allow literality alone to satisfy the infringement test would force patent law to reward literary skill and not the inventor's creativity. Since the law is intended to benefit the inventor's genius and not the scrivener's talent, the structures must do the same work in substantially the same way and accomplish substantially the same result." 6 E. Lipscomb, *Walker on Patents* sec. 22:23, at 513 (3d ed. 1987) (footnote omitted). In *Graver Tank,* the Supreme Court explained that "to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing." *Id.* at 607, 70 S.Ct. at 855. The Supreme Court continued:

Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not

require complete identity for every purpose and in every respect.... Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Id.* at 609, 70 S.Ct. at 856. A finding of equivalence, therefore, is a determination of fact. *E.g., id.* at 609, 70 S.Ct. at 856; *Omark Indus. v. Textron, Inc.,* 688 F.2d 1242, 1250 (9th Cir.1982).

**12.** Amgen, in its own product specification, states, "Ultrapure erythropoietin is a homogeneous preparation...." Amgen Biologicals at 3 (unnumbered) (Hewick Decl., Exhibit C).

**13.** This article, Lin, et al., *Cloning and Expression of the Human Erythropoietin Gene,* 82 Proc. Nat'l.Acad.Sci. USA 7580 (1985) (attached as Exhibit F to the Declaration of J. Evan Sadler in Support of Defendants' Motion for Summary Judgment of Patent Infringement [hereinafter, "Sadler Decl."]) is written, in part, by several Amgen scientists. The article states, "[The recombinant erythropoietin] has an apparent [molecular weight] of 34,000 when analyzed in an electrophoretic transfer blot." *Id.* at 7582.

32,000 to about 38,000 daltons,[14] Amgen failed to demonstrate that this variance is significant enough even to constitute a genuine issue of material fact. Without adequate factual support of its arguments, Amgen cannot succeed.

Amgen next argued that "[t]here is no definition of 'single peak by reverse phase high performance liquid chromatography (HPLC)' derivable from the '195 patent" and "Amgen's product does not meet the definition of 'single peak' by reverse phase HPLC as that term is used in the '195 patent." Opposition Memorandum I at 10–11. These arguments, however, besides appearing to be inconsistent with each other, also seem inconsistent with the product specifications of the recombinant erythropoietin in the Amgen literature, which states that the Amgen recombinant erythropoietin is a "homogeneous preparation that yields a single band and peak when analyzed by SDS polyacrylamide gel electrophoresis and HPLC respectively." Amgen Biologicals at 3 (unnumbered) (Hewick Decl., Exhibit C). Similarly, certain Amgen scientists state in other literature that the human recombinant erythropoietin "elutes as a single peak in HPLC gel filtration and reverse phase HPLC." Parker, et al., *Structural Characterization of Recombinant DNA–Derived Human Erythropoietin*, 45 Fed'n Proc. 1721 (Abstracts of the 76th Annual Meeting of the American Society of Biological Chemists 1986) (Sadler Decl., Exhibit E). Furthermore, in Dr. Recny's analysis of the Amgen recombinant erythropoietin, the Amgen product "eluted as a single peak at approximtely 31.5 minutes which corresponds to approximately 51.5% solvent B in the gradient program. When the chromatograph obtained from the Amgen human EPO was compared to the homogeneous EPO disclosed in the '195 Patent, both compounds show movement as a single peak at substantially similar positions on the chromatographic scale." Recny Decl. at para. 7. Responding to the Recny analysis, Amgen contends that Dr. Recny's "carefully chosen, but not yet cross-examined, statement" does not "show the HPLC peak by way of an exhibit so that Recny's analysis of 'single peak' can be compared to Hewick's analysis of single peak...." Opposition Memorandum I at 11.

The Court is not persuaded by this argument. Both Amgen and the defendants have described their own erythropoietin as yielding or eluting a single peak in reverse phase HPLC. Further, the defendants, through Dr. Recny's analysis of the two erythropoietin substances, have produced evidence that, with respect to a single peak in reverse phase HPLC, both substances are "substantially similar." Amgen, in response, fails "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Amgen may not simply rely upon the promise of evidence to be developed by the cross-examination of Dr. Recny at trial. *See Manego v. Orleans Bd. of Trade*, 598 F.Supp. 231, 239 (D.Mass.1984), *aff'd*, 773 F.2d 1 (1st Cir.1985), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986). Thus, having failed to support its argument with factual development, Amgen cannot succeed on this issue.

Amgen next contended that the specific activity of the Amgen recombinant erythropoietin does not fall within the '195 patent specification of at least about 160,000 IU per absorbance unit at 280 nanometers, and thus the Amgen product does not infringe the claims of the '195 patent. Again, this Court disagrees. In its own product litera-

14. Of course, it is well established that the non-moving party must go beyond the pleadings, and by affidavits, depositions, answers to interrogatories, and admissions on file, must designate specific facts showing that there is a genuine issue. *See supra* at 98. This, Amgen has failed to do. Instead, Amgen has merely asserted these facts in its memorandum and attached to its memorandum a technical article about recombinant erythropoietin that fails to support specifically these assertions. Such arguments, without the detailed factual support required by Rule 56, are wholly inadequate. *See Transurface Carriers, Inc. v. Ford Motor Co.*, 738 F.2d 42, 46 (1st Cir.1984) (holding that "[m]ere assertions of counsel made in a legal memorandum are insufficient to establish the existence of a genuine issue of material fact").

ture, Amgen states, "The specific activity of Amgen Biologicals' ultra-pure erythropoietin is 160,000 units/A280 as determined by the *in vivo* exhypoxic polycythemic mouse bioassay." Amgen Biologicals at 1 (unnumbered) (footnote omitted) (Hewick Decl., Exhibit C). Moreover, according to an article written by Amgen and Amgen-funded scientists, the recombinant human erythropoietin being used in clinical trials has a specific activity of 129,000 units per milligram of hormone. *See* Eschbach, et al., *Correction of the Anemia of End-Stage Renal Disease with Recombinant Human Erythropoietin*, 316 N.Eng.J.Med. 73, 74 (1987) (Recny Decl., Exhibit D). After converting this figure of 129,000 units/mg of hormone to those standards used in the '195 patent, the specific activity of the recombinant erythropoietin is about 174,000 IU per absorbance unit at 280 nanometers. *See* Recny Decl. at para. 9.

Additionally, the technical data sheet accompanying the Amgen recombinant human erythropoietin states the specific activity as greater than "160,000 units/A280 [by *in vivo* assay]." *See* Amgen Technical Data Sheet—Recombinant Human Erythropoietin at 1 (footnote omitted) (Recny Decl., Exhibit C). In short, Amgen failed to address the admissions found in its own product literature; instead, it presented this Court with other data concerning the specific activity of the re-combinant human erythropoietin, and argued that such data does not fall within the scope of the '195 patent claims. *See* Opposition Memorandum I at 9. Amgen's failure, however, to explain both the origin of this other data, and the reasons why this particular data is different from the data in other Amgen literature is fatal.[15] Simply put, Amgen has failed to raise a "genuine issue" on this point.

3. The Scope of the '195 Patent and Recombinant Technology.

Finally, a fundamental principle of patent law is that a product patent claim covers only the product itself, not the method or process for making the product. *See United States v. Studiengesellschaft Kohle*, 670 F.2d 1122, 1127 (D.C.Cir.1981).

> The essential difference between the two [types of patents, process and product,] relates to scope. A product patent gives the patentee the right to restrict the use and sale of the product regardless of how and by whom it was manufactured. A process patentee's power extends only to those products made by the patented process.

*Id.* at 1127 (citations omitted). It is well established that if the "patent is upon a product, and if the product complained of is the patented article substantially as described, *it makes no difference by what path or process, new or old, inferior or improved, the infringing product is manufactured.*" *G.D. Searle & Co. v. Byron Chem. Co.*, 223 F.Supp. 172, 174 (E.D.N.Y. 1963) (quoting *Procter & Gamble Co. v. Berlin Mills Co.*, 256 F. 23 [2d Cir.1919], *rev'd on another ground*, 254 U.S. 156, 41 S.Ct. 75, 65 L.Ed. 196 [1920]) (emphasis added) (citation omitted); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1541 (Fed.Cir.1983) (stating that "[t]he determination of non-infringement here was flawed by an unwarranted reading into the claims of that part of the specification devoted to a description of [a process].... Whether Stratoflex employs a different process in forming its inner layer is irrelevant, the sole question being whether the accused ... product of Stratoflex infringes the product claims of the '087 patent").

■ Although the development of recombinant technology provides the scientific and commercial communities with innovative techniques for manufacturing certain products and compositions, the patent protection of product claims has not changed. That is, a product claim still protects the use and sale of the product, regardless of

---

15. The document containing this data is entitled "Specification: Purified Bulk-Erythropoietin" and appears to be an Amgen form. Opposition Memorandum I, Exhibit D, at 1. It bears an effective date of January 26, 1988. Amgen terms this document a "product specification." Opposition Memorandum I at 9. Nowhere does Amgen explain what this document is, what its present status is (e.g., has it since been withdrawn or revised by Amgen?), or why the specific activity figure cited in it conflicts with other Amgen data.

whether the product was produced by traditional or recombinant technology. In *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 666 F.Supp. 1379 (N.D. Cal.1987), a case involving a patent covering "[a] human Factor VIII:C preparation having a specific activity greater than 2240 units/mg," *id.* at 1385, the defendant manufactured human Factor VIII:C by recombinant DNA technology. Rejecting the defendant's argument that the product claims should be limited to Factor VIII:C derived from the disclosed process only, the court stated:

> Scripps is entitled to claim purified Factor VIII:C having the characteristics of human Factor VIII:C, whether derived through its disclosed process or any other process achieving the same result.
>
> .    .    .    .    .
>
> Human Factor VIII:C as claimed in the patent therefore applies to any Factor VIII:C preparation, regardless of how produced, having the same material and functional characteristics as the plasma-derived preparation.

666 F.Supp. at 1390. This principle applies here, and this Court, therefore, ruled that a product patent claim covers that material produced by recombinent technology; if such material falls within the scope of the asserted product claims, then those patent claims are infringed. Infringement of product or composition claims depends upon the equivalence of the product ingredients and upon the substantial similarity of the proportions of those ingredients, not upon the process used to manufacture the product.

Accordingly, because no genuine issues of material fact existed on the question whether the Amgen recombinant erythropoietin infringes the claims of the '195 patent, the Court granted the motions of Chugai and Genetics for partial summary judgment with respect to this particular claim.

### B. Patent Misuse.

■ Chugai also seeks summary judgment on the issue whether Amgen's '008 Patent is unenforceable on the ground that Amgen's institution and continued prosecution of proceedings in the Commission constitutes patent misuse; that is, Amgen is attempting to enforce the '008 patent as a process patent which, Chugai alleges, is beyond the lawful scope of the patent.[16]

The doctrine of patent misuse is an equitable one, providing an equitable defense to an infringement action. Since, under patent law, a patentee is granted a monopoly of a particular invention, the doctrine of patent misuse prevents that patentee from using the patent as a means of restraining trade in areas beyond the scope of the patent. "[T]he essence of patent misuse consists of an attempt by the patent holder

---

16. As a jurisdictional matter Amgen argues that, under the doctrine of primary jurisdiction, this Court should stay this motion pending the resolution of those issues presented to the Commission. Opposition Memorandum II at 17–19. The doctrine of primary jurisdiction

> applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Although the doctrine may be involved in the appropriate course under different circumstances, *see Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305–306, 93 S.Ct. 573, 582–583, 34 L.Ed.2d 525 (1973) (upholding the stay of an antitrust suit until the Commodity Exchange Commission could decide whether the defendants had violated the Commodity Exchange Act rules); *Meditech Int'l Co. v. Minigrip, Inc.*, 648 F.Supp. 1488, 1496 (N.D.Ill.1986) (ruling that the doctrine of primary jurisdiction stayed the action until the International Trade Commission resolved whether the defendant misled the Commission), the Court need not stay action on this motion for summary judgment. The issue here is a preliminary one— whether Amgen filed its complaint with the Commission in bad faith—and such an issue does not necessarily require the special competence of the Commission. Moreover, in this opinion, the Court does not bypass the Commission; indeed, as will be explained below, the Court incorporates and relies upon a preliminary determination made by the Commission denying Chugai's motion for summary determination of the Commission complaint. *See infra* note 20. Thus, a stay of this motion is not required in this case.

to gain for himself rights not inherent in the patent itself, or to extend his monopoly beyond that legally granted to him." *USM Corp. v. Standard Pressed Steel Co.*, 453 F.Supp. 743, 748–49 (N.D.Ill.1978), *aff'd in part, vacated in part on other grounds sub nom. USM Corp. v. SPS Tech., Inc.*, 694 F.2d 505 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983); *Analytichem Int'l, Inc. v. Har–Len Assocs., Inc.*, 490 F.Supp. 271, 274 (W.D.Pa.1980) (stating that "[t]he basic vice is the attempt to extend the granted monopoly beyond the terms of the grant"). In this context, patent misuse is closely related to the principles of antitrust law. *USM Corp.*, 694 F.2d at 511–12.

The enforcement of patent rights, however, does not constitute, by itself, patent misuse. Section 271(d) of Title 35 of the United States Code provides, in relevant part:

> No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: ... (3) sought to enforce his patent rights against infringement or contributory infringement.

*See also Carpet Seaming Tape Licensing Corp. v. Best Seam Inc.*, 616 F.2d 1133, 1143 (9th Cir.1980), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983). Therefore, an attempted enforcement of a patent must be in bad faith in order to constitute patent misuse. *E.g., id.; cf. Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 812 F.2d 1381, 1385–86 (Fed.Cir. 1987) (holding that a finding of bad faith is necessary to establish antitrust liability based on patent misuse); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1289 (9th Cir.1984) (*Handgards II*) (same), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed. 2d 968 (1985). "[T]he alleged infringer [must] show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1001 (Fed.Cir.) (citing *Blonder–Tongue Laboratories, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 343, 91 S.Ct. 1434, 1450, 28 L.Ed.2d 788 [1971]), *cert. denied sub nom. BIC Leisure Prods., Inc. v. Windsurfing Int'l, Inc.*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed. 2d 565 (1986). Discussing the element of bad faith required by this affirmative defense, the Ninth Circuit, in *Handgards II*, stated:

> Ethicon's antitrust liability is premised upon its prosecution of a patent infringement suit with the knowledge that its patent was invalid. *Handgards I*, 601 F.2d at 994.... All that is required for a finding of bad faith in the context of an infringement suit is that the patent holder, Ethicon, knew that its patent was invalid. The bad faith involved—attempting to enforce a government granted monopoly to which the patent holder knows he has no right—is as much extrinsic to the suit as it is inherent in filing a legal cause of action devoid of merit.

*Id.* at 1289. *See Argus Chem.*, 812 F.2d at 1386 (ruling that "the litigant must establish that the patentee acted in bad faith because he knew that the patent was invalid") (citing *Handgards II*).[17]

In the present case, Chugai broadly asserts that "Amgen has deliberately mischaracterized its patent as claiming a process of manufacturing recombinant [erythropoietin] when, in fact, its own counsel has conceded that all of its process claims met rejection in the [Patent & Trademark Office] and were cancelled from the '008 patent application." Memorandum in Support of Defendant Chugai Pharmaceutical Co., Ltd's Motion for Summary Judgment at 28 (hereinafter, "Chugai Memorandum II"). Chugai, however, bears the burden of demonstrating that no genuine issues of

---

**17.** Although *Handgards II* and *Argus Chem.* both involved actions grounded in antitrust law rather than the doctrine of patent misuse, they are apposite here. The gravamen of both types of actions centers on the bad faith of the patentee. Not surprisingly, courts have determined that the treatment of the bad faith issue in the patent misuse context is largely the same as in antitrust law. *See, e.g., USM Corp.*, 694 F.2d at 511–12.

material fact exist on the issue whether Amgen in fact knew that the '008 patent did not cover Chugai's production of recombinant erythropoietin, yet still instituted the proceedings in the Commission. This Court rules that Chugai has not satisfied this burden.

There are a number of reasons that summary judgment on this particular claim is inappropriate at this juncture. As a preliminary matter, Robert D. Weist ("Weist"), senior vice president, general counsel, and secretary of Amgen, asserts that Amgen filed its complaint in the Commission "in the good faith belief that Chugai's importation of recombinant erythropoietin is an unfair act that should be excluded under 19 U.S.C. Secs. 1337 and 1337a." [18] Declaration of Robert D. Weist in Opposition to Defendant's Motion for Summary Judgment at para. 7 (hereinafter, "Weist Decl."). Moreover, as expressed below,[19] whether Chugai's importation of recombinant erythropoietin violates Section 337(a) of the Tariff Act of 1930 is hardly free from doubt.[20] Therefore, given these factors, this Court cannot rule as matter of law that Amgen instituted the proceedings in the Commission in bad faith.

18. In this context, there is a presumption that a patentee's infringement action is brought in good faith. *See Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986, 996 (9th Cir.1979) (*Handgards I*), cert. denied, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980); *Universal Athletic Sales Co. v. American Gym,* 480 F.Supp. 408, 423 (W.D.Pa. 1979).

19. *See infra* at 41.

20. In fact, Chugai filed a motion for summary determination in the Commission proceedings. The Administrative Law Judge, however, denied the motion on March 7, 1988. Thus, where the Commission has denied the motion for summary determination, this Court concludes that there is sufficient evidence to establish a genuine issue of material fact concerning whether the Commission proceeding is a mere sham. *Cf. Omni Resource Dev. Corp. v. Conoco, Inc.,* 739 F.2d 1412 (9th Cir.1984) (Kennedy, J.) (holding that the defendant, the plaintiff in prior state court proceedings, is immune from antitrust liability under the *Noerr–Pennington* doctrine in part because those state court proceedings could not be considered baseless where the state court granted temporary and preliminary injunctions against the subsequent antitrust case

## C. The '008 Patent and Process Claims.

In the alternative, Chugai seeks summary judgment on the issue whether the '008 patent contains process claims. Chugai asserts that the '008 patent does not contain process claims, and therefore it does not cover Chugai's process of manufacturing recombinant erythropoietin.

The background section of the '008 patent describes the invention as relating "generally to the manipulation of genetic materials and, more particularly, to recombinant procedures making possible the production of polypeptides possessing part or all of the primary structural conformation and/or one or more of the biological properties of the naturally-occurring erythropoietin." United States Patent No. 4,703,-008 at col. 1 (Complaint, Exhibit A). There are 31 claims contained in the '008 patent, and those claims, in essence, encompass the following inventions: 1) purified and isolated DNA sequences encoding erythropoietin; 2) DNA vectors for transporting such DNA sequences into host cells; and 3) host cells transformed or transfected with such DNA sequences.[21] Chugai thus contends that the '008 patent claims extend only to

plaintiff); *Shepherd Intelligence Systems, Inc. v. Defense Tech., Inc.,* 702 F.Supp. 365, 366 (D.Mass.1988) (holding that defendants' success in obtaining preliminary injunctive relief in state court was insufficient to establish as matter of law that those state court suits are not baseless).

21. The Brief Summary portion of the '008 patent describes the patent as follows:

The present invention provides, for the first time, novel purified and isolated polypeptide products having part or all of the primary structural conformation (i.e., continuous sequence of amino acid residues) and one or more of the biological properties (e.g., immunological properties and in vivo and in vitro biological activity) of naturally-occurring erythropoietin, including allelic variants thereof. These polypeptides are also uniquely characterized by being the product of procaryotic or eucaryotic host expression (e.g., by bacterial, yeast and mammalian cells in culture) of exogenous DNA sequences obtained by genomic or cDNA cloning or by gene synthesis.

· · · · ·

Novel glycoprotein products of the invention include those having a primary structural

the recombinant "starting materials," not the steps or acts involved in recombinant production of erythropoietin. *See* Memorandum in Support of Defendant Chugai Pharmaceutical Co., Ltd.'s Motion for Summary Judgment at 14–15 (hereinafter, "Chugai Memorandum II").

In the traditional patent framework, a product is wholly separate and distinct from a process. The court in *In re Amtorg Trading Corp.*, 75 F.2d 826 (3d Cir.), *cert. denied sub nom. Int'l AGR Corp. v. Amtorg Trading Corp.*, 296 U.S. 576, 56 S.Ct. 102, 80 L.Ed. 407 (1935), observed:

> The distinction between product and process patents is clear and is quite generally understood. The product patent is upon an invented or discovered article; the process patent is upon a method of making an article. It not infrequently happens that in the same letters patent invention is recognized in both the article and the method of making it, but it is the well-settled rule of law that a product patent protects only the product, and that a process patent protects only the process.

*Id.* at 832. Whether a patent protects a product or a process is an important factor in establishing the proprietary and non-proprietary rights in a particular field of technology. The legal and practical conse-

quences of the product patent, as distinguished from the process patent, are described as follows:

> A product patent gives the patentee the right to restrict the use and sale of the product regardless of how and by whom it was manufactured. A process patentee's power extends only to those products made by the patented process. A process patent thus "leaves the field open to ingenious men to invent and to employ other processes."
>
> A sale of a product made by a patented process does not itself infringe the patent; it is the unauthorized use of the process that infringes the patent.

*United States v. Studiengesellschaft Kohle*, 670 F.2d 1122, 1127–28 (D.C.Cir. 1981) (citations omitted).

Developments in biotechnology, however, have created a complex web of proprietary rights issues and have challenged the traditional norms of patent law.[22] In *Diamond v. Chakrabarty*, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980), the Supreme Court ruled that a live, human-made microorganism is patentable subject matter under 35 U.S.C. sec. 101. *Id.* at 309, 100 S.Ct. at 2208. Noting that the patent applicant's claim was not to a natural phenomenon, but to a manufactured substance which

---

> conformation sufficiently duplicative of that of a naturally-occurring (e.g., human) erythropoietin to allow possession of one or more of the biological properties thereof and having an average carbohydrate composition which differs from that of naturally-occurring (e.g., human) erythropoietin.
>
> .  .  .  .  .
>
> Also provided by the present invention are synthetic polypeptides wholly or partially duplicative of continuous sequences of erythropoietin amino acid residues.... These sequences, by virtue of sharing primary, secondary or tertiary structural and conformational characteristics with naturally-occurring erythropoietin may possess biological activity and/or immunological properties in common with the naturally-occurring product such that they may be employed as biologically active or immunological substitutes for erythropoietin in therapeutic and immunological processes.
>
> United States Patent No. 4,703,008 at cols. 10–11 (Complaint, Exhibit A).

**22.** A concern expressed by some authors and scientists is that the increased commercial in-

centives to protect intellectual property in the area of biotechnology adversely impacts the traditions of open communication with the scientific community. *See* Eisenberg, *Proprietary Rights and the Norms of Science in Biotechnology Research,* 97 Yale L.J. 177, 178 (1987). Some even regard the patent process darkly as "a means of institutionalized secrecy...." *Id.* at 185 n. 37 (citing *Commercialization of Academic Biomedical Research: Hearings Before the Subcomm. on Investigations and Oversight and the Subcomm. on Science, Research and Technology of the House Comm. on Science and Technology,* 97th Cong., 1st Sess. 79 [1981] ). Although traditional patent law doctrines restricted patent protection to applied technology, as distinguished from basic scientific research, *Diamond v. Chakrabarty,* 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980) and its progeny have extended patent protection for biotechnical innovations. Eisenberg, *supra,* at 185–90. Eisenberg suggests that the possibility of such protection poses for the inventor an apparent conflict between the scientific norms of promoting the progress of science and the commercial incentives created by scientific rewards. *Id.* at 230.

does not occur in nature, the Supreme Court stated, "[T]he patentee has produced a new bacterium with markedly different characteristics from any found in nature and one having the potential for significant utility." *Id.* at 310, 100 S.Ct. at 2208. *See Ex parte Hibberd*, 227 U.S.P.Q. 443 (P.T.O. Bd. Pt. App. & Interferences 1985) (holding that plants, plant seeds and plant tissue cultures constituted patentable subject matter under 35 U.S.C. sec. 101); *Ex parte Allen*, 2 U.S.P.Q.2d 1425, 1426–27 (P.T.O. Bd. Pat. App. & Interferences 1987) (establishing that polyploid oysters produced by the claimed method constitute patentable subject matter under Section 101, and stating that the issue is "whether the subject matter is a non-naturally occurring manufacture or compositon of matter"). These cases, however, address the the patentability of certain "manufactures" or "compositions of matter," not the processes of recombinant engineering.

In the instant case, this Court is asked to consider whether the '008 patent encompasses process claims. As previously discussed, the scope of the '008 patent claims can be ascertained as matter of law from the language of the claims, the patent specification, and the prosecution history.[23] Therefore, the issue whether the '008 patent covers Chugai's process of manufacturing recombinant erythropoietin must be first analyzed in light of the claims of the patent.

Amgen directs the Court to the following claims of the '008 patent:

4. A procaryotic or eucaryotic host cell transformed or transfected with a DNA sequence according to claim 1, 2 or 3 in a manner allowing the host cell to express erythropoietin.

.    .    .    .    .

23. A procaryotic or eucaryotic host cell transformed or transfected with a DNA sequence according to claim 7, 8, or 11 in a manner allowing the host cell to express [a polypeptide similar to erythropoietin].

23. *See supra* at 99–100.

United States Patent No. 4,703,008 at col. 40 (Complaint, Exhibit A). Although the '008 patent contains claims covering a host cell manipulated in a manner allowing the host cell to express erythropoietin, it is not clear to this Court that such claims are in fact process claims. It is ambiguous whether what is covered here is a product ("[a] procaryotic or eucaryotic host cell transformed or transfected with a DNA sequence") or the process of producing such a cell (transformation or transfection *"in a manner* allowing the host cell to express erythropoietin"). In view of this ambiguity, therefore, the Court must look to the other factors of claim construction—in particular, the prosecution history—to construe these claims.

The prosecution history of the '008 patent is telling. Amgen's initial patent application contained the following process claims:

69. A process for the production of a polypeptide having part or all of the primary structural conformation and one or more of the biological activities of naturally-occurring erythropoietin, said process comprising:

growing, under suitable nutrient conditions, procaryotic or eucaryotic host cells transformed or transfected with a DNA vector according to claim 62, and isolating desired polypeptide products of the expression of DNA sequences in said vector.

70. A process for the production of a polypeptide having part or all of the primary structural conformation and one or more of the biological activities of naturally-occurring erythropoietin, said process comprising:

growing, under suitable nutrient conditions, procaryotic or eucaryotic host cells transformed or transfected with a DNA vector according to claim 63, and isolating desired polypeptide products of the expression of DNA sequences in said vector.

71. A process for the production of a polypeptide having part or all of the primary structural conformation and one or

more of the biological activities of naturally-occurring erythropoietin, said process comprising:

growing, under suitable nutrient conditions, procaryotic or eucaryotic host cells transformed or transfected with a DNA vector according to claim 65, and isolating desired polypeptide products of the expression of DNA sequences in said vector.

72. A process for the production of a polypeptide having part or all of the primary structural conformation and one or more of the biological activities of naturally-occurring erythropoietin, said process comprising:

growing, under suitable nutrient conditions, procaryotic or eucaryotic host cells transformed or transfected with a DNA vector according to claim 67, and isolating desired polypeptide products of the expression of DNA sequences in said vector.

'008 File Wrapper Excerpts at 170–71 (Chugai Memorandum II, Exhibit D). Thereafter, on February 4, 1987, the Patent and Trade Office rejected these claims, stating:

Claims 69–72 are rejected under 35 U.S.C. 103 as being unpatentable over Talmadge et al [sic] and who disclose the basic process of recombinantly expressing and isolating polypeptides as claimed herein [sic]. Even where it is considered that one or more of the starting materials is novel, the application of an old process to such materials to produce the expected result would still be obvious within the meaning of 35 U.S.C. 103; In re Durden, supra; In re Larsen, 141 U.S. P.Q. 730 (1964). Whether or not a product produced by the claimed process possesses any unique or unexpected properties is not material to the question of whether or not the process itself would have been obvious.

'008 File Wrapper Excerpts at 307 (Chugai Memorandum II, Exhibit D). In fact, Amgen characterized those claims 69–72 as "processes for the production of polypeptides through use of claimed transformed or transfected [host cells]." '008 File Wrapper Excerpts at 172 (Chugai Memorandum II, Exhibit D).

Thereafter, in Applicant's Amendment and Reply Under 37 C.F.R. secs. 1.111 and 1.115 filed March 12, 1987, Amgen cancelled claims 14, 15, 17–36, 58, and 61–72 without prejudice and entered new claims, 73–103. In doing so, Amgen stated:

Citing to the authority of the decisions of *In re Durden* and *In re Albertson,* the Examiner rejected claims 69–72 as being directed to obvious methods in view of the DNA expression systems described in Talmadge, et al.

As previously noted Applicant has sought cancellation *without prejudice* of prior claims 69–72 and has not inserted claims corresponding thereto in this amendment. The issues raised by the rejection are no longer present in the application.

'008 File Wrapper Excerpts at 27 (footnote omitted) (emphasis in original) (Chugai Memorandum II, Exhibit D). Moreover, in its communication with the Commission, Amgen apparently does not dispute that the Patent and Trademark Office rejected those claims "specifically in process form for the use of its already-patented host cells to manufacture recombinant erythropoietin." Letter from Dennis Allegretti to Dr. Cheri M. Taylor, Int'l Trade Comm., at 1 (Jan. 21, 1988) (hereinafter, "Allegretti Letter") (Chugai Memorandum II, Exhibit G).[24] Upon this history of prosecuting the

---

24. In the same letter to the Commission, Dennis Allegretti ("Allegretti"), counsel for Amgen, stated:

[S]uch claims were rejected by the [Patent and Trademark Office] under authority of *In re Durden.*

. . . . .

Regardless of the hope that may have been offered for the allowance of such process claims after *In re Durden* and prior to the rejection in the Amgen application, regardless of whatever changes in rejection practice and policy by the [Patent and Trademark Office] may arise after that rejection, and regardless of Amgen's continuing efforts to secure process claims in its presently pending continuation application, I submit that the controlling fact is that Amgen's vigorous efforts to secure the allowance of process claims in its original application for the '008 patent, from its filing in 1984 until rejection in 1987, were denied under the authority of *In re Durden.*

claims under this patent, the Patent and Trademark Office issued the '008 patent.

Under the doctrine of prosecution history estoppel, a patentee is precluded from obtaining a claim construction in an infringement action where such an interpretation would "resurrect subject matter surrendered during prosecution of his patent application." *Thomas & Betts Corp. v. Litton Systems, Inc.,* 720 F.2d 1572, 1579 (Fed.Cir.1983). That is,

> [W]here a patentee has, during prosecution before the [Patent and Trademark Office], amended his claims to add a limitation (or cancelled claims containing such a limitation) to overcome a rejection and obtain a patent, he is estopped from later contending in an infringement action that the claims should be interpreted as if that limitation were not present.

*Square Liner 360 Degrees, Inc. v. Chisum,* 691 F.2d 362, 370 (8th Cir.1982); *see Graham v. John Deere Co.,* 383 U.S. 1, 33–34, 86 S.Ct. 684, 701–702, 15 L.Ed.2d 545 (1966); *Schriber–Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 218, 61 S.Ct. 235, 238, 85 L.Ed. 132 (1940); *Townsend Eng'g Co. v. Hitec Co.,* 829 F.2d 1086, 1090–91 (Fed.Cir.1987); *Thomas & Betts Corp.,* 720 F.2d at 1579; *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1362–63 (Fed.Cir. 1983). *See generally* 6 E. Lipscomb, *Walker on Patents* sec. 21:10, at 287–97 (3d ed. 1987).

■ The doctrine of prosecution history estoppel applies to the construction of claims 4 and 23 of the '008 patent. Claims 69–72, which involved "a process for the production of a polypeptide" were all rejected by the Patent and Trademark Office under the authority of *In re Durden,* 763 F.2d 1406 (Fed.Cir.1985). Amgen then cancelled these claims and amended its '008 patent application. Given the Patent and Trademark Office's rejection of those process claims and Amgen's subsequent cancellation of such claims and the similarity of these claims to a "process interpretation"[25] of claims 4 and 23, this Court rules that the '008 patent does not contain any

process claims; specifically, the '008 patent does not contain a process claim covering the process of manufacturing recombinant erythropoietin.

This ruling, however, is limited. This Court expressly eschews resolution—on this record—of certain of the other issues in this dispute. First, this Court's ruling does not determine whether the '008 patent covers Chugai's process of manufacturing recombinant erythropoietin. It is clear that if Chugai used host cells covered by the claims of the '008 patent in its production of recombinant erythropoietin, and such production was conducted in the United States, such use would constitute an infringement of the '008 patent. *See Roche Prods. Inc. v. Bolar Pharmaceutical Co.,* 733 F.2d 858, 861–63 (Fed.Cir.), *cert. denied,* 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984). Sufficient facts are not presently before the Court to permit a decision whether Chugai has infringed the product claims contained in the '008 patent.

■ More importantly, the Court does not decide whether Chugai's importation of recombinant erythropoietin violates Section 337 of the Tariff Act of 1930 (19 U.S.C. sec. 1337) and 19 U.S.C. sec. 1337a. Indeed, only the Commission, and not this Court, is conferred jurisdiction by these statutes. *E.g., Ashlow Ltd. v. Morgan Constr. Corp.,* 672 F.2d 371, 375; 4th Cir., 1982) (per curiam); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 846 n. 42 (S.D.N.Y.1988) (citing *Ashlow, Ltd.,* 672 F.2d at 372); *Meditech Int'l Co. v. Minigrip, Inc.,* 648 F.Supp. 1488, 1493–94 (N.D.Ill.1986); *In re Convertible Rowing Exerciser Patent Litigation,* 616 F.Supp. 1134, 1140 (D.Del.1985); *Enka B.V. v. E.I. DuPont de Nemours,* 519 F.Supp. 356, 362 n. 8 (D.Del.1981); *see also Tompkins Seals, Inc. v. The West Co.,* No. 85–4929 (E.D.Pa.1985) (1985 WESTLAW 4952 at 4). Moreover, although this Court ruled that the '008 patent contains no process claims covering the process of manufacturing recombinant erythropoietin,

---

Allegretti Letter at 1, 2–3 (Chugai Memorandum II, Exhibit G).

25. That is, an interpretation of claims 4 and 23 that treats them as process, not product, claims.

the '008 patent was construed exclusively within the framework of patent law. It may well be that the word "process" in 19 U.S.C. sec. 1337a, which section provides that "[t]he importation for use, sale, or exchange of a product made, produced, processed, or mined under or by means of a process covered by the claims of any unexpired valid United States letters patent, shall have the same status ...," should be interpreted more broadly than the above interpretation of "process" made by this Court in the context of patent law. On this issue, however, the Court expresses no opinion.

Accordingly, the Court GRANTED the motion of Chugai and Genetics for partial summary judgment on the claim that Amgen infringes the '195 patent. The Court also GRANTS the motion of Chugai for partial summary judgment on the claim that the '008 patent does not contain a process claim.