**AMGEN, INC., Plaintiff,**

**Ortho Pharmaceutical Corp., Ortho Biotech, Inc., OMJ Pharmaceuticals, Inc., Intervening Plaintiffs,**

v.

**GENETICS INSTITUTE, INC., Defendant.**

**Civ. A. No. 94–11818–WGY.**

United States District Court, D. Massachusetts.

Feb. 14, 1995.

Dennis D. Allegretti, Allegretti & Witcoff, Ltd., Boston, MA, Lloyd R. Day, Jr., Cooley, Godward, Castro, Huddleson & Tatum, Palo Alto, CA, for Amgen, Inc.

William F. Lee, Hale & Dorr, Boston, MA, for Genetics Institute, Inc.

David R. Schmahmann, Nutter, McClennen & Fish, Boston, MA, Jeffrey I.D. Lewis, Gregory L. Diskant, Theodore B. Van Itallie, Jr., Patterson, Belknap, Webb & Tyler, New York City, for Ortho Biotech, Inc., OMJ Pharmaceuticals, Inc. and Ortho Pharmaceutical Corp.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This action is the latest front in a scientific and legal war, now into its second decade, over the production and purification of erythropoietin ("EPO").[1] EPO is a human protein that stimulates the production of red blood cells and is used primarily for the clinical treatment of anemia, particularly anemia caused by renal disease.[2] The parties to this action are two biotechnology firms, Amgen, Inc. ("Amgen") and Genetics, Inc. ("Genetics"), which have obtained certain patents over the years relating to EPO. A prior patent infringement action brought by Amgen against Genetics resulted, *inter alia*, in the invalidation of certain claims of an EPO patent held by Genetics. Genetics has since obtained another patent, the centerpiece of this action, whose claims, according to Amgen, are identical to those invalidated in the prior action. Amgen now moves for summary judgment pursuant to Fed.R.Civ.P. 56, seeking a declaration that Genetics is barred by the doctrine of claim preclusion from asserting any claim of its new patent against Amgen. Genetics opposes Amgen's motion and has filed a cross-motion for summary judgment seeking a declaration that it is not so barred.

## I. BACKGROUND

Amgen and Genetics both obtained patents relating to EPO in 1987. On June 30, 1987, Dr. Rodney Hewick obtained U.S. Patent No. 4,677,195 (the " '195 patent") from the United States Patent and Trademark Office ("Patent Office") entitled "Method for the Purification of Erythropoietin and Erythropoietin Compositions." Dr. Hewick assigned his patent to Genetics. The '195 patent claims both homogeneous EPO characterized by certain attributes and compositions thereof and a

---

1. This opinion presumes familiarity with opinions issued in prior EPO-related litigation involving the parties and their licensees in this and other courts. *See Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 13 U.S.P.Q.2d 1737, 1989 WL 169006 (D.Mass.1989) (Saris, M.J.), *aff'd in part, rev'd in part, vacated in part,* 927 F.2d 1200 (Fed.Cir.1991); *Amgen, Inc. v. United States Int'l Trade Comm'n,* 902 F.2d 1532 (Fed.Cir.1990); *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 808 F.Supp. 894 (D.Mass.1992); *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.,* 706 F.Supp. 94 (D.Mass.1989).

2. For a basic introduction to EPO, see generally, William R. Carlson, ERYTHROPOIETIN: THE DEVELOPMENT OF A PHARMACEUTICAL PRODUCT (May 5, 1988) (unpublished B.A. Thesis, Princeton University).

method for purifying human EPO.[3] On October 27, 1987, the Patent Office issued U.S. Patent No. 4,703,008 (the " '008 patent"), entitled "DNA Sequences Encoding Erythropoietin," to an Amgen scientist, Dr. Fu–Kuen Lin. The '008 patent, which is not directly at issue in this litigation, claims purified and isolated DNA sequences encoding erythropoietin and host cells transformed or transfected with a DNA sequence.

On the day it received the '008 patent, Amgen filed suit in this Court (the "First Action") against Genetics and Genetics' licensee, Chugai Pharmaceutical Co., Ltd. ("Chugai"). In the First Action, Amgen alleged that (1) the production, use and sale of recombinant EPO ("rEPO") by Genetics and Chugai infringed its '008 patent; (2) the '195 patent was invalid, or in the alternative, that Amgen did not infringe the claims of the '195 patent; and (3) the First Action defendants' future production and sale of rEPO would infringe the '008 patent. Genetics and Chugai counterclaimed, alleging that (1) Amgen infringed the '195 patent; (2) the '008 patent did not provide patent protection for rEPO; (3) Amgen engaged in unfair competition; (4) the '008 patent was invalid; and (5) Amgen's use of its '008 patent violated the Sherman Act.

On December 24, 1988, this Court granted Genetics and Chugai's motion for partial summary judgment on the claim that Amgen infringed the '195 patent, and on January 31, 1989 granted Chugai's motion for partial summary judgment on the claim that the '008 patent did not contain a process claim. *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 706 F.Supp. 94, 110–11 (D.Mass.1989) (the "Summary Judgment Decision") (setting forth the Court's reasoning on both motions). Neither of these rulings addressed the validity of the '195 or the '008 patents.

By consent of the parties, the First Action was then tried before Magistrate Judge (now District Judge) Patti B. Saris. Magistrate Judge Saris held, *inter alia*, that Claims 1 and 3 of the '195 patent were valid and that Amgen had infringed those claims. *Amgen,*

*Inc. v. Chugai Pharmaceutical Co.*, 13 U.S.P.Q.2d 1737, 1739, 1989 WL 169006 (D.Mass.1989) (*"Amgen I"*). The Court thus held that Claims 1 and 3 were "enabled," that is, that the specification allowed one skilled in the art to obtain a pure EPO composition with the characteristics set forth in the claim. *Id.* at 1794; 35 U.S.C.A. § 112 (1984) ("The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same ...."). On appeal, the Federal Circuit, *inter alia*, reversed the district court's determination that Claims 1 and 3 were enabled. *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1203, 1215–17 (Fed.Cir.1991) (*"Amgen II"*). The Federal Circuit held that there was no credible evidence that those skilled in the art could make the claimed purified material by the disclosed process, and that all evidence was to the contrary. *Id.* at 1216. The First Action eventually terminated upon the entry of a judgment by this Court on May 19, 1993 (the "May 19, 1993 Judgment") that Amgen's '008 patent was duly and legally issued, valid and enforceable in law and equity, and had been infringed by Genetics. This Court also entered judgment against Genetics for damages in the amount set forth in a Settlement Agreement between the parties.

The May 19, 1993 Judgment afforded the combatants only a brief cease fire. On June 21, 1994, Genetics obtained U.S. Patent No. 5,322,837 (the " '837 patent"), entitled "Homogeneous Erythropoietin Compositions and Methods of Using Same." The '837 patent, which claims homogeneous EPO characterized by certain attributes, was issued based on a "continuation" application filed by Genetics, and its specification was in many material respects similar to the original disclosure supporting the '195 patent. Genet-

---

**3.** Homogeneity is a measure of the purity of a protein by the degree of its separation from other proteins.

ics's '195 and '837 patents make similar, although not identically worded, claims.[4]

On the same day Genetics obtained the '837 patent, it brought suit in the United States District Court for the District of Delaware against Ortho Pharmaceutical Corp. ("Ortho"), a licensee and distributor of Amgen, charging that Ortho infringed the '837 patent by "making, using, and selling in the United States the pharmaceutical compositions containing homogeneous erythropoietin claimed in the '837 Patent." Genetics thus charged back into the fray as though the earlier extensive litigation that culminated in *Amgen II* in the Federal Circuit had never occurred.

Amgen duly filed the instant declaratory judgment action in this Court on September 9, 1994.[5] Amgen seeks declarations that (1) Genetics' '837 patent is unenforceable against Amgen and its privies because of the Settlement Agreement; (2) Genetics is barred by principles of claim preclusion from asserting any claims of the '837 patent against Amgen and its privies due to the prior decisions of this Court and of the Court of Appeals for the Federal Circuit; (3) the '837 patent is invalid and unenforceable for various reasons; and (4) if valid, the '837 patent is not infringed by pharmaceutical compositions comprising Amgen rEPO. Genetics counterclaimed, alleging infringement of the '837 patent. Amgen and Genetics now both move for summary judgment on the issue of whether principles of claim or issue preclu-

sion prevent Genetics from asserting certain claims under the '837 patent against Amgen.

## II. DISCUSSION

### A. Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Rule 56 is not "a disfavored procedural shortcut, but rather ... an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555. Summary judgment may be granted as appropriate in patent cases, especially given the Federal Circuit's repeated expression of the view that "there is a strong public interest in settlement of patent litigation." *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 477 (Fed.Cir.1991) (reversing district court's denial of summary judgment on grounds of claim preclusion); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576–77 (Fed.Cir.1989) (patent disputes amenable to summary judgment).

### B. Claim Preclusion

The applicability of claim preclusion here necessarily depends upon this Court's interpretation of the holding of the Federal Circuit in *Amgen II*. Amgen asserts that

---

**4.** Claims 1 and 3 of the '195 patent are as follows:

> 1. Homogeneous erythropoietin characterized by a molecular weight of about 34,000 daltons on SDS PAGE, movement as a single peak on reverse phase high performance liquid chromatography and a specific activity of at least 160,000 IU per absorbance unit at 280 nanometers.

> .    .    .    .    .

> 3. A pharmaceutical composition for the treatment of anemia comprising a therapeutically effective amount of the homogeneous erythropoietin of claim 1 in a pharmaceutically acceptable vehicle.

United States Patent No. 4,677,795 (June 30, 1987) at 8–9.

Claim 1 of the '837 patent is as follows:

> 1. A pharmaceutical composition for stimulating production of red blood cells comprising

a therapeutically effective amount of homogeneous human EPO protein characterized by a molecular weight of about 34,000 daltons in a single band on SDS PAGE and movement as a single peak in reverse phase high performance liquid chromatography and a pharmaceutically acceptable vehicle.

United States Patent No. 5,322,837 (June 21, 1994) at 9.

**5.** On December 6, 1994, this Court allowed the motion of Ortho Pharmaceutical Corp., Ortho Biotech, Inc., and OMJ Pharmaceuticals, Inc. (the "Intervenors") to intervene. According to the Intervenors' complaint, Ortho Pharmaceutical Corp. and Ortho Biotech, Inc. have moved for a stay or a transfer to this District of the action commenced in federal district court in Delaware. Genetics has apparently agreed to stay the Delaware action contingent on the three companies' intervention in this action.

the Federal Circuit held that the specification underlying the '195 patent simply did not enable homogeneous EPO, whether derived from urinary or recombinant sources. Genetics' principal contention is that the Federal Circuit held that the '195 patent specification did not enable purification of EPO *with a specific activity level of 160,000 IU/AU* and, therefore, the decision has nothing to say regarding the '837 patent which, according to Genetics, claims homogeneous EPO without regard to its specific activity.[6]

The key question now comes into focus: Did the Federal Circuit hold explicitly, or was it implicit in and necessary to its holding, that specific activity level of 160,000 IU/AU is an essential element of the claimed substance, homogeneous EPO? This question is central because, if the attainment of a specific activity level of 160,000 IU/AU is a sine qua non of homogeneous EPO as defined by Genetics in the '195 patent and the First Action, and if the Federal Circuit so decided, then Genetics' dropping the specific activity requirement from its '837 patent specification is of no legal significance, *see In re Katz*, 467 F.2d 939, 941–42 (C.C.P.A.1970), and Genetics is barred as to Amgen and its privies from relitigating whether the '837 patent specification enables homogeneous EPO.

With some justification, Amgen emphasizes the Federal Circuit's single-sentence summary of its holding: "Thus, the ['195] patent fails to enable purification of either rEPO or uEPO." *Amgen II*, 927 F.2d at 1217. As to rEPO, Amgen also relies on the Federal Circuit's statement that the '195 patent itself "discloses [Genetics'] purification efforts on rEPO and indicates that [Genetics] did not obtain purified rEPO." *Id.*

This Court declines Amgen's invitation to suspend the analysis at this point, however, and turns to a contextual analysis of the exposition of the matter by the Federal Circuit in *Amgen II*. To understand fully that analysis in context, it is helpful to return to return to the initial stages of that litigation. In the Summary Judgment Decision, this Court discussed the centrality of specific activity to homogeneity:

> It had been thought in the scientific community that erythropoietin purified by methods described by Miyake was homogeneous as measured by a specific activity on the order of 80,000 [IU/AU]. [Genetics' assignor] Dr. Rodney Hewick ... however, discovered that *truly homogeneous erythropoietin* has a specific activity of at least about 160,000 IU/AU and, further, that Miyake's erythropoietin composition is not in fact homogeneous, but contains large amounts of several non-erythropoietin contaminants.

*Amgen, Inc. v. Chugai Pharmaceutical Co.*, 706 F.Supp. 94, 96 (D.Mass.1989) (emphasis supplied).[7] At the time, Genetics agreed wholeheartedly with this assessment, and even boasted to the Federal Circuit:

> Dr. Hewick received the ['195] patent after discovering that existing samples of EPO, thought to be pure and homogeneous by the scientific community, actually contained significant contaminants. Dr. Hewick's invention *taught the world that homogeneous EPO has three characteristics, including a specific activity of "at least 160,- 000 IU/AU,"* ... Dr. Hewick's discovery *defined the characteristics and established the clinical standard* for the therapeutic use of homogeneous EPO. It is no coincidence that, *after* Dr. Hewick's discovery,

6. "Specific activity" is a measure of the potency of EPO, expressed as a ratio of International Units, measuring the ability of EPO to cause formation of red blood cells, per absorbance unit, the amount of light absorbed by a sample of EPO measured by a spectrophotometer at a given wavelength. *See Amgen II*, 927 F.2d at 1215 n. 10.

7. This summary judgment conclusion is not itself preclusive of the present litigation because, though it was not questioned by the Federal Circuit, it played no role in that court's determination that the '195 patent did not, in fact, enable homogeneous erythropoietin. Restatement (Second) of Judgements § 27 cmts. h, o (1982); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 704 (Fed.Cir.1983), *cert. denied*, 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984) ("judicial statements regarding the scope of patent claims are entitled to collateral estoppel effect in a subsequent infringement suit only to the extent that determination of scope was essential to a final judgment on the question of validity or infringement"). It is, however, an important part of the record before the Federal Circuit.

Amgen purified its EPO to levels which gave it the very characteristics of homogeneous EPO as defined by the '195 patent and not those of the EPO which the scientific community thought was homogeneous in 1984.

Joint Reply Brief for Appellants at 1–2 (attached as Exhibit F to Memorandum in Support of Amgen's Motion for Summary Judgment of Res Judicata) (emphasis supplied) (citation omitted).[8]

The Federal Circuit began its discussion of the enablement of Claims 1 and 3 of the '195 patent by stating the issue as follows:

> Amgen challenges the district court's determination that "the '195 patent enables a person of ordinary skill in the art to obtain homogeneous EPO [including rEPO and uEPO] from natural sources" having a ... specific activity of at least 160,000.

*Amgen II*, 927 F.2d at 1215 (quoting *Amgen I*, 13 U.S.P.Q.2d at 1794) (brackets in original). The court framed the question, which it then answered in the affirmative, as "whether the [district] court erred in concluding that the claims requiring 160,000 IU/AU ... were enabled." *Id.* at 1216. These statements, however, beg, rather than answer, the question of whether the Federal Circuit considered "homogeneous" and "with a specific activity of 160,000 IU/AU" to be synonymous—the latter merely amplifying the meaning of the former, or as two sepa-

rate and distinct characteristics of EPO. After thoroughly examining the content and structure of *Amgen II*, the arguments made to the Federal Circuit by the parties, the context in which that decision was rendered, and the history of the preceding litigation, it is this Court's opinion that the Federal Circuit necessarily considered the '195 patent as claiming homogeneous EPO, an essential element of which was a specific activity level of 160,000 IU/AU.[9] Thus, the '195 patent simply "fails to enable purification of either rEPO or uEPO," *Amgen II*, 927 F.2d at 1217, which, in the view of this Court, means that the specification of the '195 patent does not enable one skilled in the art to obtain homogeneous EPO, which by Genetics's own definition is EPO with a specific activity level of 160,000 IU/AU.

■ From this conclusion, the ineluctable logic of the doctrine of claim preclusion compels a declaration that Genetics may not invoke the spectre of the '837 patent against Amgen and its privies. Whether under the name claim preclusion or res judicata, the principle and its elements are familiar: a claim is precluded where there is (1) a final judgment on the merits in an earlier action; (2) an identity of the cause of action in both the earlier and present suits; and (3) an identity of parties or privies in the two suits. *Kale v. Combined Ins. Co. of America*, 924

---

8. Although Genetics has apparently changed its mind on this point, it is unnecessary for the Court to address Amgen's undeveloped argument that judicial estoppel bars Genetics from asserting in these proceedings a position contrary to that which it asserted before the Federal Circuit. *See Wang Lab., Inc. v. Applied Computer Sciences, Inc.*, 958 F.2d 355, 358 (Fed.Cir.1992) (Federal Circuit applies regional circuit law in reviewing applicability of judicial estoppel, which is not "peculiar" to patent law); *Patriot Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208, 212 (1st Cir.1987) (employing judicial estoppel where litigant plays "fast and loose" with the courts and when "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice") (citation omitted). The Court does note, however, some question as to whether Genetics obtained sufficient benefit from its previous assertions before the Federal Circuit to invoke judicial estoppel here. *See Casas Office Machines, Inc. v. Mita Copystar America, Inc.*, 42 F.3d 668 (1st Cir.1994) (judicial estoppel inapplicable where

litigant did not succeed in gaining any advantage as a result of earlier statement "manifestly at odds" with its present position).

9. Of course, the Federal Circuit did not purport to establish as a matter of scientific fact, binding on scientists worldwide, that truly homogeneous EPO has a specific activity of at least 160,000 IU/AU. Dr. Hewick arrived at that figure by subjecting EPO with an actual value of 83,000 IU/AU to reverse phase high performance liquid chromatography. He weighed the chromatograph, found that at least half of the area under the chromatograph curve was attributable to something other than EPO, and then doubled the 83,000 to reach a theoretical specific activity of "at least about 160,000 IU/AU." *Amgen II*, 927 F.2d at 1216. The Federal Circuit commented that this procedure was "possibly valid as a means for estimating the specific activity of a pure sample," but it did not establish that Genetics "had a workable method for actually obtaining the pure material that it claimed." *Id.*

F.2d 1161, 1165 (1st Cir.), *cert. denied,* 502 U.S. 816, 112 S.Ct. 69, 116 L.Ed.2d 44 (1991); *Hartley v. Mentor Corp.,* 869 F.2d 1469, 1471 n. 1 (Fed.Cir.1989) (applying regional circuit law of res judicata to patent dispute).

The first and third elements are relatively straight-forward here. The May 19, 1993 Judgment is a final decision on the merits of Genetics' action against Amgen's rEPO product for infringement of patent claims to "homogeneous" EPO based upon the disclosure of the '195 patent. The same parties to this action did battle in the previous litigation.

Finally, there is, in the claim preclusion sense, an identity of claims in these two actions. A close comparison of the '195 and '837 patents reveals few differences apart from the absence of an explicit requirement of 160,000 IU/AU in Claim 1 of the '837 patent. Both patents begin with an identical Abstract, followed by Figure 1, a profile of an EPO composition treated by reverse phase high performance liquid chromatography. The '195 patent has a Figure 2 depicting an amino acid sequence of a human EPO protein, which the '837 patent omits. The '837 patent does, however, list the identical amino acid sequence within the text of the patent, and thus the absence of Figure 2 from the '837 patent is not a substantive alteration from the '195 patent. The '837 patent, as previously noted, has a different title, and contains a Cross–Reference to Related Applications. The following sections of the two patents are identical: Field of the Invention ("The present invention is directed to the purification of [EPO] and to compositions comprising highly purified [EPO]");

Background of the Invention ("... For therapeutic use of EPO, it is necessary to purify the EPO protein to homogeneity"); Summary of the Invention ("... The EPO preferably has a specific activity of at least 120,000 [IU/AU], and more preferably 160,000 IU"); Detailed Description of the Invention ("No matter what the source of EPO is, the EPO protein must be purified to homogeneity for therapeutic use"); Example 1: Purification of Erythropoietin; and Example 2: Purification of EPO.[10] Most importantly, both patents claim a pharmaceutical composition comprising a therapeutically effective amount of homogeneous EPO protein. In short, the specifications of the two patents are substantively identical.

Amgen claims in this action that the '837 patent is not enabled and thus may not be enforced against it. In the First Action, Amgen claimed, and was vindicated by the Federal Circuit, that the '195 patent was invalid and unenforceable due, *inter alia,* to lack of enablement. As the specifications underlying both patents are indistinguishable in all material respects, there is an identity of claims present here such that Genetics is barred by the doctrine of claim preclusion from relitigating against Amgen and its privies the question of whether the '837 patent specification enables a person skilled in the art to make and use therapeutically effective homogeneous EPO. *See In re Katz,* 467 F.2d 939, 941–42 (C.C.P.A.1970);[11] *In re Prutton,* 204 F.2d 291, 296 (C.C.P.A.1953), *overruled on other grounds by In re Craig,* 411 F.2d 1333 (C.C.P.A.1969);[12] *see also In*

---

**10.** As further evidence of the almost complete reliance of the '837 patent specification on the '195 patent specification, both refer in the "Background of the Invention" section to a Figure 2. As noted, the '195 patent has a Figure 2; the '837 patent does not.

**11.** The facts of *Katz* are similar to those presented here. There, the United States Court of Customs and Patent Appeals, the predecessor to the Court of Appeals for the Federal Circuit, affirmed the rejection by the Patent Office Board of Appeals of certain claims of a continuation application based on res judicata. 467 F.2d at 942. In a previous action, the District Court had found all claims of the parent application unpatentable, and the appellate court affirmed. The claims of the continuation patent were "substantially the

same" as those involved in the prior action, the only difference being that the continuation claims contained a single additional word, "frameless," to describe the invention sought to be patented, containerized cargo vans. The *Katz* court held that the word "frameless" did not add anything to the original disclosure. *Id.* at 942. Thus res judicata barred the applicant from relitigating the patentability of the claims in the courts or before the patent office because "the issues considered in the prior action are the same as those raised here." *Id.*

**12.** The *Prutton* case also involved the validity of claims of a continuation application where the original claims, pertaining to a lubricating composition, had previously been found unpatentable. 204 F.2d at 294. In language applicable

re Herr, 377 F.2d 610, 626 (C.C.P.A.1967) (Smith, J., concurring) (dictum) (citing In re Szwarc, infra) (reading Szwarc as holding that collateral estoppel applied where claim included specific product upon which federal court had previously held same specification deficient as to that specific product, because issue whether the specification "taught how to use that compound" had already been decided); In re Szwarc, 319 F.2d 277, 284 (C.C.P.A.1963) (res judicata applicable where later claims broader in scope than previously rejected unenabled claim but resultant product inclusive of product of rejected claim).

From the early days of the republic, our patent law has required that in exchange for a government-sanctioned monopoly on the rights to an invention or discovery, the inventor must teach the world the secret behind the method or device. Compare 35 U.S.C.A. § 112 (1984), supra, with Act of April 10, 1790, ch. 7, § 2, 1 Stat. 109 ("specification shall be so particular ... as not only to distinguish the invention or discovery from other things before known and used, but also to enable a workman or other person skilled in the art of manufacture ... to make, construct or use the same, to the end that the public may have the full benefit thereof, after the expiration of the patent term"); see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 146–51, 109 S.Ct. 971, 975–78, 103 L.Ed.2d 118 (1989); In re Goodman, 11 F.3d 1046, 1050 (Fed.Cir.1993) (specification must teach how to make and use the invention as broadly as it is claimed). The rationale for the enablement requirement is that

[a]n inventor deprives the public of nothing which it enjoyed before his discovery, but gives something of value to the community by adding to the sum of human knowledge. He may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed [the inventor] for seventeen years, but upon the expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use.

United States v. Dubilier Condenser Corp., 289 U.S. 178, 186–87, 53 S.Ct. 554, 557, 77 L.Ed. 1114 (1933) (citations omitted); see also O'Reilly v. Morse, 56 U.S. 62, 119–20, (15 How. 62, 65, 127–28), 14 L.Ed. 601 (1853) (Taney, C.J.) (one skilled in the art must be able to produce precisely the described result by using the means specified by the inventor); Grant v. Raymond, 31 U.S. 218, 247 (6 Peters 141, 160) (1832) (Marshall, C.J.) (correct specification is a prerequisite to obtaining a patent in order to give the public "the advantage for which the privilege is allowed, and is the foundation of the power to issue the patent."). When a putative inventor fails or refuses to fulfill the obligation to teach precisely what is claimed, the inventor is not entitled to the protections of the patent law. See, e.g., Morton Int'l, Inc. v. Cardinal Chem. Co., 5 F.3d 1464, 1469–70 (Fed.Cir. 1993) (affirming determination of lack of enablement where fifty examples in specification "obviously teach something," but not what was defined in the claims).

In Amgen II, the Federal Circuit held that Genetics had not met its pedagogical duty because the '195 patent specification failed to

to the instant case, the Court of Customs and Patent Appeals stated:

· [T]he decision of the Court of Appeals on the earlier application became the final decision, so far as appellant is concerned, as to all subject matter actually contained in any of the claims involved in that proceeding ... Only if the instant claims on appeal contain subject matter patentably different from the subject matter of those claims is appellant entitled to have them considered on their merits. Thus the issue to be determined is not whether the appealed claims are patentable ... but whether they are patentably different from the claimed subject matter of his earlier application ...

Id. (emphasis supplied) (citations omitted). The court held that although the later claims "define the additives somewhat differently than in the earlier case," the later claims "are broader than, and read directly on" the earlier application and thus are not "patentably different," but "directed to essentially the same subject matter." Therefore res judicata compelled the invalidation of the continuation application. Id. at 296. The same is true here: the '837 and the '195 patents are not patentably different, for although the later patent may purport to define homogeneous EPO somewhat differently, it is unquestionably directed to the same subject matter as the '195 patent.

demonstrate how to obtain pure EPO. Although Genetics may have taught the world "something," see *Morton International,* 5 F.3d at 1470, i.e. that true homogeneity requires a certain level of specific activity, it did not show one skilled in the art how to use and make the EPO which it defined to be homogeneous. Therefore, it defies logic, as well as the goals of the enablement requirement, for Genetics now to claim to have cured that deficiency by withdrawing its supposedly groundbreaking discovery that truly homogenous EPO has a specific activity of 160,000 IU/AU, and expect to be rewarded with a patent for the same claimed subject matter enforceable against Amgen's proven invention. Quite simply, Genetics is attempting to teach less and get more; this Court cannot countenance such conduct antithetical to the longstanding scheme established by the patent laws of the United States.

### III. CONCLUSION

For the reasons set forth above, Amgen's Motion for Summary Judgment of Res Judicata is *GRANTED* and Genetics' Cross–Motion for Summary Judgment on Amgen's Claim for Declaratory Judgment of Res Judicata is *DENIED.*

This Court declares that Genetics is bound by the prior determination that the '195 patent specification does not enable the making of homogeneous EPO, and thus may not assert the virtually identical claims of the '837 patent against Amgen's homogeneous rEPO product.

As this declaration resolves the essential dispute among the parties, the Court need not reach Amgen's other claims, as they have been rendered moot. Judgment will enter granting Amgen and the Intervenors the declaration just made, dismissing the other issues Amgen raises as moot, and dismissing Genetics' counterclaim as precluded.

### *JUDGMENT*

This Court declares that Genetics is bound by the prior determination that the '195 patent specification does not enable the making of homogeneous EPO, and thus may not assert the virtually identical claims of

the '837 patent against Amgen's homogeneous rEPO product.

As this declaration resolves the essential dispute among the parties, the Court need not reach Amgen's other claims, as they have been rendered moot. The other issues Amgen raises are dismissed as moot. Genetics' counterclaim is dismissed as precluded.